## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

**L.L. by and through her Next Friend,**
**NANCY HUBBARD, NANCY HUBBARD,**
**and RAYMOND LANER,**

      **Plaintiffs,**

    v.

**ALAMOGORDO POLICE DEPARTMENT, an Executive Department of the CITY OF ALAMOGORDO, a municipal corporation organized under the laws of the State of New Mexico; DAVID KUNIHIRO, individually and in his official capacity as the Chief of Police for the Alamogordo Police Department; AARON RAMIREZ, individually and in his official capacity as Police Officer for the Alamogordo Police Department; ALAMOGORDO MUNICIPAL SCHOOL DISTRICT NUMBER ONE, a/k/a, ALAMOGORDO PUBLIC SCHOOL DISTRICT; ALAMOGORDO BOARD OF EDUCATION; ANGELA CADWALLADER in her official capacity as President of the Alamogordo Board of Education; MICHAEL CRABTREE, in his official capacity as Superintendent of the Alamogordo Public School District, LAIGHA BOYLE, individually and in her official capacity as Principal of Mountain View Middle School / Alamogordo Public School District,**

      **Defendants.**

**NO.**
**(JURY DEMANDED)**

## <u>COMPLAINT</u>

COME NOW, Plaintiffs, L.L., by and through her next friend, NANCY HUBBARD, NANCY HUBBARD, and RAYMOND LANDER, by and through undersigned Counsel, and for their Complaint state and aver as follows:

## I. INTRODUCTION / SUMMARY

1.      Plaintiffs, L.L., a child, through her next friend, Nancy Hubbard, Nancy Hubbard, individually, and Raymond Laner bring their claims under 42 U.S.C. §1983 and the New Mexico Civil Rights Act, NMSA 1978, §41-4A-1 et seq., for deprivation and violation of their rights under the United States and New Mexico Constitutions to be free from unreasonable search and seizure.  The Plaintiffs' claims arise from incidents which occurred on November 4, 2025 and November 5, 2025 in which Mountain View Middle School Principal, Laigha Boyle, or other School Personnel, the Alamogordo Police Department, and Officer Aaron Ramirez, seized/arrested L.L., removed L.L. from school, and transported L.L. to a location off campus for questioning.  L.L. was not suspected of delinquent activity, but was believed to be a witness to or victim of incidents at the School in which a male student was alleged to be harassing and inappropriately touching female students.  On November 5, 2025, Officer Ramirez went to the homes of three female students believed to be witnesses or victims of the inappropriate behavior of the male student, including the home of L.L.   On November 5, 2025, Officer Ramirez entered and searched the main areas of the home of L.L., Nancy Hubbard, and Raymond Laner under the pretense of investigating an anonymous "CPS" report about L.L.  The New Mexico Children, Youth, and Families Department records reflect that no report or investigation about L.L. had been made to that agency.  The Defendants' seizure/arrest of L.L. and Officer Ramirez's search of the Hubbard/Laner home were effected without warrants, and no exception to the Fourth Amendment warrant requirement applies.

2

2.     Plaintiff, L.L., brings this civil action against all Defendants seeking damages pursuant to 42 U.S.C. §1983 for violations of L.L.'s right to be free from unreasonable seizure under the Fourth and Fourteenth Amendments to the United States Constitution.  L.L. brings ancillary claims against the Defendants, City of Alamogordo and Alamogordo Police Department, and Alamogordo Public School District, under the New Mexico Civil Rights Act, NMSA 1978, §41-4A-1 et seq., for violations of L.L.'s right to be free from unreasonable seizure under Article II, Section 10 of the New Mexico Constitution.

3.     Plaintiff, Nancy Hubbard, brings this civil action against all Defendants, seeking damages pursuant to 42 U.S.C. §1983 for violations of Ms. Hubbard's rights to procedural and substantive due process under the Fourteenth Amendment to the United States Constitution. Nancy Hubbard brings ancillary State claims against the Defendants, City of Alamogordo and Alamogordo Police Department, and Alamogordo Public School District, under the New Mexico Civil Rights Act, NMSA 1978, §41-4A-1 et seq., for violations of her rights to substantive and procedural due process under Article II, Section 18 of the New Mexico Constitution.

4.     Plaintiffs, L.L., Nancy Hubbard, and Raymond Laner, bring this civil action against the Defendants, the City of Alamogordo and Alamogordo Police Department,  David Kunihiro, and Aaron Ramirez, seeking damages pursuant to 42 U.S.C. §1983 for violations of their rights to be free from unreasonable search under the Fourth Amendment to the United States Constitution.  Plaintiffs bring ancillary State claims against the Defendants, the City of Alamogordo and Alamogordo Police Department, under the New Mexico Civil Rights Act, NMSA 1978, §41-4A-1 et seq., for violations of their rights to be free from unreasonable search under Article II, Section 10 of the New Mexico Constitution.  Plaintiffs seek further relief against the above-named Defendants on Count VII of the Complaint for spoliation of evidence.

3

## II.  JURISDICTION AND VENUE

5.      This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and under federal law, particularly 42 U.S.C. § 1983.

6.       This Court has original jurisdiction over these federal claims under 28 U.S.C. §§ 1331 and 1343.

7.      Supplemental jurisdiction over the claims made under New Mexico law is proper pursuant to 28 U.S.C. §1367.

8.      Venue is proper in the United States District Court for the District of New Mexico under 28 U.S.C. §1391(b) as the events giving rise to the claims occurred within the District.

## III.  PARTIES

9.      Plaintiff, L.L., a child, is a resident and citizen of the state of New Mexico.

10.     Plaintiff, Nancy Hubbard, brings claims as the Next Friend of L.L. and individually.  Ms. Hubbard is a resident and citizen of the state of New Mexico.

11.     Plaintiff, Raymond Laner, is a resident and citizen of the state of New Mexico.

12.     Defendant, Alamogordo Police Department, is an agency of the City of Alamogordo, a municipal corporation organized under the laws of the state of New Mexico, and a person under 42 U.S.C. §1983.

13.     Defendant, David Kunihiro ("Chief Kunihiro"), is a resident and citizen of the State of New Mexico and, at all times relevant to these proceedings, was the Chief of Police for the Alamogordo Police Department ("APD").  At all times relevant to these proceedings, David Kunihiro was the lead administrator for APD with the authority and responsibility of creating, implementing, and enforcing the policies, procedures, and practices of and for the APD and for training and supervising APD personnel.

14. Defendant, Aaron Ramirez ("Officer Ramirez"), is a resident and citizen of the State of New Mexico and, at all times relevant to these proceedings, was a Police Officer for the APD.

15. At all times relevant to these proceedings, Defendants David Kunihiro and Aaron Ramirez acted under color of state law and in the course and scope of their employment or service to the APD and the City of Alamogordo, and are being sued in their individual and official capacities.

16. Defendant, Alamogordo Municipal School District # 1, a/k/a, the Alamogordo Public School District, (hereinafter, "District") is a political subdivision of the state of New Mexico and a person under 42 U.S.C. §1983.

17. Defendant, Alamogordo Board of Education, (hereinafter, "Board") is an elected body charged with governing the Alamogordo Public School District subject to the powers conferred and responsibilities imposed by New Mexico law. Defendant, Board, is a person under 42 U.S.C. §1983. Defendant, Angela Cadwallader, is the President of the Board, and is being sued in her official capacity.

18. Defendant, Michael Crabtree ("Superintendent Crabtree"), during all times relevant to these proceedings, was the Superintendent and lead administrator for the District. Superintendent Crabtree is being sued in his official capacity.

19. Defendant, Laigha Boyle ("Principal Boyle"), during all times relevant to these proceedings, was the Principal of Mountain View Middle School, a public school within the District and under the authority of the Board. At all times relevant to these proceedings, Principal Boyle acted under color of state law and in the course and scope of her employment or service to the District, and is being sued in her individual and official capacities.

5

## IV.  GENERAL ALLEGATIONS

20.    Plaintiffs incorporate Paragraphs 1 through 19 herein as though set forth in their entirety.

21.    In November of 2024, the Plaintiff, L.L., was thirteen (13) years old and a student in the eighth (8th) grade at Mountain View Middle School.

22.    Mountain View Middle School (hereinafter, "MVMS") is a public middle school within the District.  At all times material to the allegations of this Complaint, Defendant, Laigha Boyle was the Principal of Mountain View Middle School.

23.    Laigha Boyle is a New Mexico, licensed, school administrator.  As Principal of MVMS, Laigha Boyle was responsible for the daily operation of MVMS, overseeing the curriculum of MVMS, providing for the safety of the MVMS students, training of MVMS personnel, ensuring compliance of MVMS personnel with APS policies, and supervising MVMS personnel.

24.    On the morning of November 3, 2024, while L.L. was at MVMS, a friend of L.L's, hereinafter referred to as "Student 1", confided in L.L. about a circumstance which occurred at a MVMS dance.  Student 1 told L.L. that a male MVMS student (hereinafter referred to as "Male Student"), had bothered Student 1 at the dance, and had touched her in a way that made her feel uncomfortable ("Incident").  Around their lunch period, L.L. and Student 1 went to the MVMS Office and reported the incident to the School's resource officer, Collier Buffington, and to Principal Boyle.

25.    Upon information and belief, on the morning of November 4, 2024, the father of Student 1 learned of the Incident and contacted Principal Boyle at MVMS.

26.     Upon information and belief, subsequent to being contacted by the father of Student 1 about the Incident, Principal Boyle, an MVMS security guard, or another MVMS administrator or staff member ("MVMS Personnel") contacted the Alamogordo Police Department to report the Incident.

27.     On the morning of November 4, 2025, APD Officer Aaron Ramirez reported to MVMS to investigate the Incident.

28.     Officer Ramirez's investigation of the Incident and/or interaction with the juvenile witnesses believed to have knowledge of the Incident or other inappropriate or offensive actions of the Male Student, are reflected, in part, in an Alamogordo Police Department Call Detail Report identified by Call Number "P24C68001" and Incident #24A-29642 (hereinafter "Call Detail Report").

29.     Officer Ramirez's investigation of the Incident and/or interaction with the juvenile witnesses believed to have knowledge of the Incident or other inappropriate or offensive actions of the Male Student, are reflected, in part, in an Alamogordo Police Department Incident report drafted by Officer Ramirez for Incident #24A-29642, dated 11/04/2024 09:21:00 (hereinafter, "Ramirez Report").

30.     Officer Ramirez's Report relates that on November 4, 2024 at approximately 9:21 A.M., Officer Ramirez was dispatched to Mountain View Middle School in reference to "criminal sexual contact". The Report further states that upon arrival at MVMS, Officer Ramirez made contact with a school security guard who stated that the parent of Student 1 and Student 1 were in the MVMS Office.

31.     All or a part of Officer Ramirez's November 4, 2024 interactions with Student 1 and the father of Student 1 are recorded and/or memorialized in video records of the Alamogordo

Police Department from Officer Ramirez's lapel and/or body-worn camera (hereinafter, "Ramirez BWV").

32.     The Ramirez Report indicates, and the Ramirez BWV shows that Officer Ramirez met with Student 1 and the father of Student 1 at MVMS.

33.     The Ramirez BWV from his meeting with the father of Student 1 and Student 1 shows that Principal Boyle and an, as yet, unidentified male ("John Doe 1") believed to be a MVMS security guard, were present when Officer Ramirez met with the father of Student 1 and Student 1 on November 4, 2024.

34.     The Ramirez Report states that the father of Student 1 related to Officer Ramirez that Student 1 felt uncomfortable around the Male Student and that the Male Student had touched a girl under her skirt the past school year and had raped another of Student 1's friends.

35.     The Ramirez BWV shows that Student 1 provided Officer Ramirez with additional details about the Incidents and her friends.  Student 1 stated to Officer Ramirez that she and four other girls had discussed the Male Student, and that those other girls had stated that the Male Student had made sexually offensive and/or inappropriate statements to them and/or had touched them in a sexually offensive or inappropriate manner.  Student 1 provided Officer Ramirez with the names of the friends she was referencing, including L.L.,  and three other girls referred to herein as Student 2, a MVMS student, Student 3, a MVMS student, and Student 4, a former MVMS student who was then being homeschooled.

36.     The Ramirez BWV from his discussions with the father of Student 1 and Student 1 shows that during the meeting, Officer Ramirez asked Principal Boyle if Principal Boyle was going to give Officer Ramirez all of the other female students' information so that he could set up interviews for them.  She responded, "I certainly can".

37.     Officer Ramirez asked Student 1 for addresses for L.L., Student 2, Student 3, and Student 4.  The Ramirez BWV shows that Principal Boyle stated to Officer Ramirez that she would provide him addresses for "all three".  Upon information and belief, Principal Boyle's reference to "all three" indicated that she would provide information for the three girls who were then current students at MVMS, as Principal Boyle stated to Officer Ramirez that she would get information from the secretary for the "girl who doesn't go here".

38.     At the conclusion of his meeting with the father of Student 1 and Student 1, Officer Ramirez told Student 1 that if she saw her friends that day, not to discuss the matter with Students 2, 3, 4, and L.L. because he was going to have to talk to them about it separately, and he didn't want them to "shy away from it".

39.     At the conclusion of his meeting with Officer Ramirez, Principal Boyle, and John Doe 1, Student 1's father asked Student 1 if she wanted to stay at school or if she wanted to go home.  She stated that she wanted to go home.

40.     At the conclusion of the meeting, Principal Boyle gave Officer Ramirez computer printouts which she stated were for the student who no longer goes to MVMS, for the other students Student 1 named, and for the Male Student.

41.     The computer printouts which Principal Boyle provided to Officer Ramirez included the names and contact information for L.L.'s, Student 2's, Student 3's, and Student 4's parents, guardians, or custodians.

42.     The computer printouts Principal Boyle gave to Officer Ramirez included information from or related to L.L.'s educational records protected under the Family Educational Rights and Privacy Act "FERPA", 20 U.S.C. §1232g.

43. At that time, on November 4, 2024, and at all relevant times thereafter, Principal Boyle and John Doe 1 were aware that L.L. and Students 2, 3, and 4 were possible witnesses to the Incident, incidents, or events involving the Male Student, or victims of inappropriate or illegal behavior or actions of the Male Student. Further, Principal Boyle and John Doe 1 did not have any information which would lead a reasonable person to believe that L.L. or Students 2, 3, and 4, may have committed any criminal act related to the Incident or otherwise.

44. At that time, on November 4, 2024, Principal Boyle and John Doe 1 did not have any information which would lead a reasonable person to believe that L.L. or Students 2, 3, and 4 were victims of neglect or abuse in their homes.

45. At that time, on November 4, 2024, and at all relevant times thereafter, Officer Ramirez, was aware that L.L. and Students 2, 3, and 4 were possible witnesses to the Incident, incidents, or events involving the Male Student, or victims of inappropriate or illegal behavior or actions of the Male Student. Further, Officer Ramirez did not have any information which would lead a reasonable person to believe that L.L. or Students 2, 3, and 4, had committed any criminal act related to the Incident or otherwise.

46. At that time, on November 4, 2024, Officer Ramirez did not have any information which would lead a reasonable person to believe that L.L. or Students 2, 3, and 4 were victims of neglect or abuse in their homes.

47. On November 4, 2024, Officer Ramirez did not have a reasonable suspicion to believe that L.L. or Students 2, 3, and 4 were "abused or neglected" children, as those terms are defined under New Mexico law.

48. Upon information and belief, prior to Officer Ramirez proceeding with his investigation, he contacted and communicated with his supervisor(s) at the APD, and obtained instructions from the supervisor(s) and Chief of Police, David Kunihiro.

49. Officer Ramirez was instructed by his supervisor to proceed with interviews of Students 2, 3, 4, and L.L. by removing them from MVMS to an outside location, to wit, Kids, Inc. for questioning.

50. Upon information and belief, the standard APD protocol for investigations of allegations of criminal activity involving an APS school student required that a school resource officer or APD detective be assigned to conduct the investigation.

51. Upon information and belief, the assignment of Officer Ramirez to conduct the investigation of the Incident was not consistent with APD policies, practices, or protocol.

52. The Ramirez Report states that after Officer Ramirez met with Student 1 and the father of Student 1, Officer Ramirez began to set up "safehouse" interviews for the juveniles to gather more information. The remainder of the Ramirez Report relates only what each of the "juveniles" stated regarding the Incident or incidents involving the Male Student, but it does not provide information related to the circumstances under which Officer Ramirez contacted, transported, and spoke to Student 2, Student 3, Student 4, or L.L.

53. However, APS and APD records show that on November 4, 2024, Students 2 and 3 and L.L. were summoned from their classes at MVMS by APS Personnel, and instructed to go to the School Office. Each was met there by Officer Ramirez who removed each girl from the School's premises and transported them to Kids, Inc. in Alamogordo, New Mexico, where each was questioned about her knowledge of the Incident or incidents involving the Male Student.

11

Student 4 was picked up from her home by Officers Ramirez and transported to Kids, Inc. for questioning.

54.    Kids, Inc., is a child advocacy center serving Otero and Lincoln County, New Mexico that collaborates with law enforcement agencies to conduct interviews of children.

55.    At all times relevant to these proceedings, Kids, Inc. and Kids, Inc. personnel were acting at the request and direction of the APD and Officer Ramirez.

<u>Arrest of Student 2</u>

56.    At approximately 11:50 A.M., Principal Boyle or other APS Personnel, summoned Student 2 to the MVMS Office.  At that time, Officer Ramirez met Student 2 at the Office, and escorted Student 2 out of the MVMS building.

57.    The Ramirez BWV shows that as Officer Ramirez left the MVMS campus with Student 2, he activated his lapel camera.  The Ramirez BWV shows that Officer Ramirez stated to Student 2, "I have to take you to go get interviewed, you're just going to answer a couple of questions…".  Student 2 can be heard stating in the video, "Oh, I know how this works…I hope my mom doesn't get mad at me."

58.    Officer Ramirez instructed Student 2 to get into the backseat of his police car, and he drove Student 2 to Kids, Inc. in Alamogordo, New Mexico.  At  Kids, Inc., staff and/or Officer Ramirez questioned Student 2 about the Incident or incidents involving or related to the Male Student.

59.    At Kids, Inc., Student 2 was instructed to show/draw on an image of a human form those locations where the Male Student had touched her.

60.    After the interview of Student 2 at Kids, Inc., Officer Ramirez drove Student 2 back to MVMS, and delivered her to the School Office at approximately 1:20 P.M.

12

61.     APD records include Ramirez BWV of his transportation of Student 2 to and from Kids, Inc.

62.     Upon information and belief, prior to Officer Ramirez's removal of Student 2 from the MVMS campus, neither Principal Boyle nor any other MVMS Personnel notified a parent, guardian, or custodian of Student 2 of the facts related to the Incident, Officer Ramirez's investigation, or that Student 2 was being removed from the School by a law enforcement officer.  Upon information and belief, no parent, guardian, or custodian of Student 2 authorized Officer Ramirez to remove Student 2 from School.

63.     Student 2's aunt, with whom Student 2 resides, did not learn that Student 2 had been removed from MVMS by a law enforcement officer until Student 2 sent the aunt a text message while Student 2 was being transported by Officer Ramirez to Kids, Inc.  Student 2's aunt called MVMS and requested information about Student 2's location, but was told by an MVMS staff member that the staff member was not allowed to release that information.

Arrest of L.L.

64.     At approximately 1:20 P.M. on November 4, 2024, Principal Boyle or other APS Personnel, summoned L.L. to the MVMS Office.  L.L. did not believe she had a right or the ability to disobey the instruction that she go to the MVMS Office.

65.     L.L. had not expected to leave school that day, but thought that perhaps her grandmother, Nancy Hubbard, was taking L.L. out of school for an appointment.

66.     L.L. has lived with her grandmother, Ms. Hubbard, since 2011 when L.L. was one (1) year old.  On or about 2013, L.L.'s mother left L.L. and L.L.'s younger brother in the full-time care of Ms. Hubbard.  L.L.'s mother executed a New Mexico Power of Attorney, appointing Nancy Hubbard as attorney-in-fact to perform all parental responsibilities and exercise all rights

of a parent for L.L.  The Power of Attorney is renewed by L.L.'s mother periodically in accordance with New Mexico law and, at all times relevant to this Complaint, Ms. Hubbard was/is acting as L.L.'s parent under a valid power of attorney.

67.    Although APD records, in the form of Officer Ramirez's lapel camera videos, exist of Officer Ramirez's encounters with and transportation of Students 2, 3, and 4 from MVMS to Kids, Inc. and back, only a thirteen (13) second video of Officer Ramirez's interactions with L.L. exist.  In response to a New Mexico Inspection of Public Records Act Request ("IPRA") made by Ms. Hubbard to APD, through Counsel, for all videos and records related to L.L., the custodian of records for APD reported that, with the exception of the 13 second video, all other videos of Officer Ramirez's interactions with L.L. were broken.

68.    When L.L. arrived at the MVMS Office, she was approached by Officer Ramirez who told L.L. that he "had to take her" to be questioned or to answer some questions.

69.    Officer Ramirez did not tell L.L. why he was removing her from school.

70.    Officer Ramirez told L.L. that she could take her backpack and belongings with her, or leave them in the School Office. L.L. left her personal belongings with a secretary or other MVMS Personnel who were present in the MVMS Office at that time.

71.    L.L. was frightened, confused, and nervous.  L.L. believed she did not have the right or ability to end the encounter with Officer Ramirez, leave and/or go back to her class, refuse to go with Officer Ramirez, or otherwise disobey or refuse to follow Officer Ramirez's commands.

72.    L.L. followed Officer Ramirez's commands and Officer Ramirez escorted L.L. to his police car where he instructed L.L. to get into the back seat.

73.    Officer Ramirez transported L.L. to Kids, Inc. where Officer Ramirez, and/or a Kids, Inc. staff member, acting on the instructions of Officer Ramirez, asked L.L. questions about the Incident or incidents with the Male Student.  L.L. did not believe she had the right or ability to refuse to answer the questions, and she answered the questions posed to her.

74.    L.L. was embarrassed, humiliated, and afraid to answer the questions posed to her at Kids, Inc.  The questions were of a sexual nature, and L.L. was asked to disclose highly-personal information.  L.L. was humiliated and very uncomfortable discussing the matters with a stranger.

75.    Officer Ramirez returned L.L. to MVMS at approximately 1:59 P.M. on November 4, 2025.

76.    At the time of the return, L.L. was escorted to the MVMS Office by Officer Ramirez.  Other students were present in the hallways and MVMS Office, and L.L. was humiliated and embarrassed that the students saw her in the custody of the police.

77.    Neither APS nor APD Personnel contacted Nancy Hubbard prior to L.L. being removed from class and MVMS.  Ms. Hubbard did not give consent for APS or APD to remove L.L. from MVMS and/or to transport L.L. to another location.

78.    L.L. did not try to call Ms. Hubbard when L.L. was in Officer Ramirez's custody, because she believed she was not allowed to do so or that would get in trouble for using her phone.  L.L. did not call her Grandmother after L.L. was returned to School because she thought someone from the School would have called.

79.    Ms. Hubbard was extremely distressed when she learned on November 5, 2025 that L.L. had been removed from MVMS without her knowledge or permission.  Ms. Hubbard was worried and upset that she had not been told that L.L. might have been hurt, and that Ms.

Hubbard had not been notified in advance of any questioning so that she could have ensured that the mature subject matter about which L.L. was questioned was handled sensitively and appropriately, with Ms. Hubbard present to provide L.L. comfort and support.

80.    Principal Boyle's and/or other APS Personnel's actions in transferring custody of L.L. to Officer Ramirez violated APS policies related to on-campus arrests of students.

<u>Arrest of Student 3</u>

81.    At approximately 2:08 P.M. on November 4, 2024, Principal Boyle or other APS Personnel, summoned Student 3 to the MVMS Office.  The Ramirez BWV shows that Officer Ramirez activated his lapel camera prior to meeting with Student 3 in the Office.

82.    The Ramirez BWV shows that Officer Ramirez stated to Student 3 that he had to take her to answer some questions about something that happened and that, "I'm pretty sure you're already aware about what it is."

83.    Student 3 can be heard in the Ramirez BWV, "what is this for", and "where are we going?"  Officer Ramirez states that they are going to "Kids, Inc."

84.    Officer Ramirez instructed Student 3 to get into the backseat of his police car, and he drove Student 3 to Kids, Inc. in Alamogordo, New Mexico.  At Kids, Inc., Kids, Inc. staff and/or Officer Ramirez questioned Student 3 about the Incident or incidents involving or related to the Male Student.

85.    Upon information and belief, neither APS nor APD Personnel contacted the parent, guardian, or custodian of Student 3 before Student 3 was removed from MVMS. However, upon information and belief, Student 3 sent a message to her mother stating that she was being transported to, or that she was located at Kids, Inc.

16

86.    While Student 3 was being questioned at Kids, Inc., Student 3's mother arrived at that location visibly upset.  Student 3's mother was met by Officer Ramirez.  Student 3's mother asked if Student 3 was okay.  Officer Ramirez would not provide any information to Student 3's mother other than to state that Kid's Inc. specializes in interviewing kids, that Student 3 was being questioned about something that might have happened at the Middle School, that Student 3 might have been a witness or victim, but that Student 3 was not in trouble.  Student 3's mother stated that as long as Student 3 was okay, she didn't care if she was in trouble.

87.    Upon information and belief, after Student 3 was interviewed at Kids, Inc., Officer Ramirez released Student 3 to her mother.

Arrest of Student 4

88.    At approximately 3:05 P.M. on November 4, 2025, Officer Ramirez travelled to the home of Student 4.  Officer Ramirez was met at that location by Alamogordo Police Officers Cisneros and Padilla.

89.    APD records include video of Officer Ramirez's interactions with Student 4's family members which was obtained from Officer Ramirez's, Officer Cisneros', and Officer Padilla's lapel cameras.

90.    At the home of Student 4, Officer Ramirez first spoke with an adult who indicated that the adult was the wife of Student 4's guardian, Student 4's grandmother.  When Officer Ramirez stated that he needed to talk to Student 4 and they "would be taking her somewhere else to question her", Officer Cisneros interjected that Student 4 would be taken to Kids, Inc.

91.    The adult stated that before she could give consent for the officers to take Student 4, the adult needed to discuss it with her wife.

17

92.    Student 4's grandmother came to the door and asked what it was about. Officer Ramirez stated that it involved an incident at the Middle School months earlier. Student 4's guardian stated that Student 4 did not go to the Middle School, to which Officer Cisneros stated that it involved "some allegations" and that "we need to take [Student 4] so we can get her interviewed". Officer Cisneros stated that Student 4 was not in trouble, but that the Officers needed to take her to get interviewed, and they would explain what was going on when they brought Student 4 back.

93.    Student 4's grandmother stated, "So I'm guessing we don't have a choice in this?" Officer Ramirez responded, "No, you don't."

94.    Neither Officer Cisneros nor Officer Padilla corrected Officer Ramirez's statement. Neither explained that Student 4 and Student 4's grandmother did not have to consent to Student 4 being questioned or removed from her home by the police officers. Officer Ramirez, Officer Cisneros, and Officer Padilla did not explain that if Student 4's grandmother consented to Student 4 being questioned, that the grandmother could take Student 4 to another location herself, and be present during any questioning.

95.    Rather, Student 4's grandmother's wife stated that they would get Student 4 ready for the officers.

96.    Officer Padilla escorted Student 4 to his police car and instructed Student 4 to get into the back seat.

97.    Officer Ramirez transported Student 4 to Kids, Inc. where Student 4 was questioned. At approximately 4:16 P.M., Officer Ramirez returned Student 4 to her residence. There, he again spoke with the wife of Student 4's grandmother. The interaction was recorded on Officer Ramirez's lapel camera.

18

98.     The Ramirez BWV shows that the wife of Student 4's grandmother immediately asked what was going on and if Student 4 was okay.  Officer Ramirez explained that there was an incident at the Middle School with the Male Student making sexualized comments, and that he would follow up with the Male Student.  Officer Ramirez then left.

99.     The next day, November 5, 2024, Officer Ramirez went to the homes of Student 4, Student 2, and L.L. and conducted illegal, warrantless searches of those homes.  Upon information and belief, Officer Ramirez did not visit or search the home of Student 3.

<u>Illegal Search of Student 4's Home</u>

100.    On November 5, 2024, Officer Ramirez returned to the home of Student 4 and again spoke with Student 4's grandmother, and the wife of Student 4's grandmother.  The interactions were recorded on Officer Ramirez's lapel camera.

101.    Upon returning to the home of Student 4, Officer Ramirez stated to the wife of Student 4's grandmother that "there was a CPS report, anonymously, reported that there is a lack of supervision and caretaking going on here."  Officer Ramirez stated, "I just need to go in there and make sure she has basic needs, food, water, electricity, where she sleeps…but it's not regarding that, it's something referencing why I was here yesterday. So there's, it's kind of a big…".

102.    The Ramirez BWV shows that Student 4's grandmother opened the door, and Officer Ramirez entered the residence. Student 4's grandmother stated that she thought the CPS report had been made by her daughter-in-law.  Officer Ramirez stated, "No, it's something completely different.  It's regarding why I was here yesterday."

103.    After some explanation from Officer Ramirez regarding his inability to provide Student 4's grandmother with details about his investigation of the Incident and the Male

19

Student, the Grandmother's wife asked, "So, it's from yesterday?"  Officer Ramirez stated, "Yes, it's still from yesterday, it's not something completely different.  It's still an anonymous report so I don't know who called it in. But I still need to see food, water, electricity, where she sleeps and all that."

104.    Student 4's grandmother and the grandmother's wife showed Officer Ramirez their kitchen area and explained about all of the food they had in the house.  Again, Student 4's grandmother asked, "So this has to do with yesterday?"  Officer Ramirez responded, "Yes, I guess she had brought up, I know she's homeschooled…"

105.    Student 4's grandmother and the grandmother's wife explained that Student 4 had experienced bullying at MVMS, so Student 4's grandmother had withdrawn her from MVMS and enrolled her in online school to keep her safe.

Illegal Search of Student 2's Home

106.    On November 5, 2024, Officer Ramirez went to the home of Student 2 where he met with an adult female who identified herself as being Student 2's grandmother and an adult male who identified himself as being the boyfriend of Student 2's aunt ("Adult Male").  The interactions were recorded on Officer Ramirez's lapel camera.

107.    Adult Male stated that Student 2's aunt is the guardian of Student 2.

108.    Officer Ramirez introduced himself to Student 2's grandmother and stated, "The reason why I am here is because there was an anonymous CPS report that was reported I believe last night so I'm kinda just here…".

109.    Officer Ramirez stated to the Adult Male, "Basically, I'm here because last night there was a CPS report that came out for a lack of supervision and stuff like that…".  The Adult Male asked, "Lack of supervision?"  Officer Ramirez responded, "Like I said, I'm not entirely

20

sure who reported it, but I don't know if she told you that yesterday that she was pulled yesterday to go basically answer some questions, so it's still stemming from that issue."

110.    Officer Ramirez then asked the Adult Male if Student 2 had discussed what had happened the day before, and if Student 2 had discussed what happened with the Male Student. Officer Ramirez stated:  "Basically, I'm just here to follow up if she's disclosed anything."

111.    Officer Ramirez stated to the Adult Male that as far as the lack of supervision, he thought it related to Student 2 walking to the school bus.  Officer Ramirez stated, "I just have to make sure she has food, water, electricity, and a bed to sleep on".  Officer Ramirez entered the residence where the Adult Male showed him that Student 2 had a bedroom, and that the house had running water and electricity.

Unlawful Search of the Hubbard/Laner Home

112.    On November 5, 2025, Officer Ramirez went to the home of L.L. ("Hubbard/Laner Home"). L.L.'s uncle, Plaintiff, Raymond Laner, who goes by the name, "Alex", resides at that location and was present.

113.    Along with L.L.'s grandmother, Plaintiff, Nancy Hubbard, Mr. Laner has been a primary caregiver for L.L. and L.L.'s younger brother since on or about 2013.

114.    Officer Ramirez's initial interactions with Mr. Laner on November 5, 2025 were recorded on Officer Ramirez's lapel camera.

115.    Mr. Laner stepped out of the residence to speak with Officer Ramirez.

116.    The Ramirez BWV shows that Officer Ramirez stated, "The reason I'm here, there was a CPS report that came in last night and I'm just here to follow up on it."

21

117. Officer Ramirez asked Mr. Laner if he was L.L.'s legal guardian. Mr. Laner stated that he was not, that his mother, Nancy Hubbard, is L.L.'s guardian and that Ms. Hubbard was at work.

118. Mr. Laner provided Officer Ramirez with Ms. Hubbard's phone number, and Officer Ramirez instructed Mr. Laner to call Ms. Hubbard to let her know that Officer Ramirez was at the Hubbard/Laner Home. Mr. Laner complied.

119. When Ms. Hubbard answered Mr. Laner's call, Mr. Laner explained to Ms. Hubbard that there was an Alamogordo Police Officer at the home who had stated that the previous night there was a CPS call about L.L.

120. Ms. Hubbard was extremely distressed upon hearing of a CPS report involving L.L. She stated that she would be right there. However, Officer Ramirez stated that he would just speak with Ms. Hubbard on the telephone.

121. Officer Ramirez took the phone from Mr. Laner and stated to Ms. Hubbard: "There was a CPS report that came in last night regarding an incident that happened sometime within this last year to now with her friends and a boy from school. There's allegations that this boy has been constantly, I guess, allegedly touching the girls and even as far as the word 'rape' was used, and we're just trying to find out exactly what is going on. Yesterday, I don't know if she told you she did get pulled from school for interviews."

122. Ms. Hubbard stated that she did not know about L.L. being removed from MVMS.

123. Officer Ramirez stated that L.L.'s name "did come up in that CPS intake and, basically, I just have to follow up on it."

22

124. Officer Ramirez asked Ms. Hubbard if she had discussed the matter with L.L. Ms. Hubbard stated that she has a close relationship with L.L., but that L.L. had not discussed an incident with a boy at school. Ms. Hubbard stated that Officer Ramirez had Ms. Hubbard's permission to speak with L.L. about it and that her son, Alex, was at home and would be there and could listen in. Ms. Hubbard stated that L.L. would not be afraid to speak in front of Alex.

125. Officer Ramirez stated that he could not ask L.L. questions and that is why she was taken to Kids, Inc. because they specialize in interviewing kids.

126. Ms. Hubbard stated that she would discuss the matter with L.L. when she got off of work at 5:00 P.M.

127. Officer Ramirez stated that L.L. was told the day before that she was not in trouble. He stated, "I know it's kind of alarming if police show up and want to ask questions".

128. Ms. Hubbard stated that after speaking with L.L. she would relate any information to Officer Ramirez.

129. After Officer's Ramirez's discussion with Ms. Hubbard, Officer Ramirez turned off his lapel camera.

130. The Alamogordo Police Department, in response to an IPRA request made by Ms. Hubbard, through Counsel, represented that no video exists of Officer Ramirez's further interactions with Mr. Laner on November 5, 2024.

131. After Officer Ramirez concluded his call with Ms. Hubbard, he stated to Mr. Laner that he had to enter the residence to make sure that there was food, running water, and electricity. Officer Ramirez entered the Hubbard/Laner Home where he examined the main living room and kitchen areas.

132.    Mr. Laner, L.L., and L.L.'s younger brother were present, and they watched Officer Ramirez search the home.

133.    Mr. Laner was frightened and extremely distressed upon learning of a "CPS report" about L.L.  Mr. Laner understood from Officer Ramirez's explanation that Officer Ramirez was investigating, and had the authority to investigate, allegations that L.L. was being abused or neglected at home.

134.    Officer Ramirez did not ask for permission to enter the Hubbard/Laner Home.

135.    Mr. Laner interpreted Officer Ramirez's statements that "he had to" enter the Hubbard/Laner Home to make sure that there was food, water, and electricity, as being mandatory.  Mr. Laner did not believe he had the right or ability to refuse to allow Officer Ramirez entry into the home, and Mr. Laner did not want to interfere with what Officer Ramirez indicated was his lawful authority to enter the Hubbard/Laner Home.

136.    Mr. Laner understood that both an allegation of the abuse or neglect of L.L. or his interference with Officer Ramirez's investigation could result in L.L.'s removal from the Hubbard/Laner Home.  Accordingly, Mr. Laner did not interfere with Officer Ramirez's entry into the Hubbard/Laner Home.

137.    In response to a request for confidential records made by Ms. Hubbard to the New Mexico Children, Youth, and Families Department ("CYFD"), through Counsel, the CYFD custodian of records stated that CYFD did not receive a report about or related to L.L. in November of 2024.  In response to a request for records related in any way to L.L. in November of 2024, CYFD stated that it had no responsive records.

138.    Officer Ramirez's statements and suggestions to Mr. Laner and Ms. Hubbard that an anonymous report had come in to the Alamogordo Police Department about L.L. were false.

24

139. Officer Ramirez did not have a warrant or other lawful authority to enter the Hubbard/Laner Home and/or to search the Hubbard/Laner Home as part of his investigation of the MVMS Incident or other incidents.

140. Even had there been a CYFD report related to an allegation of the abuse or neglect of L.L., Officer Ramirez did not have a warrant or other lawful authority to enter the Hubbard/Laner Home and/or to search the Hubbard/Laner Home as part of his investigation of such a report.

141. No exception to the United States Constitution Fourth Amendment and New Mexico Constitution, Article II, Section 10 warrant requirements applies to Officer Ramirez's entry into and search of the Hubbard/Laner Home.

142. Officer Ramirez knew that Mr. Laner and Ms. Hubbard believed that Officer Ramirez was investigating an allegation of familial abuse or neglect of L.L. Officer Ramirez's statements to Mr. Laner and Ms. Hubbard about a "CPS report" were intended by Officer Ramirez to create that belief and reliance.

143. Officer Ramirez intended to cause Mr. Laner and Ms. Hubbard fear and distress by making the false statement that L.L. was the subject of a "CPS" report.

144. Officer Ramirez intentionally induced Mr. Laner's reliance on the false representation regarding a "CPS report" in order to gain access to the Hubbard/Laner Home.

145. Officer Ramirez's statements that there had been a CPS report regarding L.L.'s care accomplished its intended effect.

Damages

146. L.L. had suffered a significant disruption in her life due to her separation from her mother on or about 2013.

25

147.    Since L.L.'s mother had left L.L. and L.L.'s younger brother in Ms. Hubbard and Mr. Laner's care on or about 2013, Ms. Hubbard and Mr. Laner devoted their attention to providing L.L. and her younger brother with a safe, stable, secure, and loving home.

148.    L.L. overheard Officer Ramirez's statements to Mr. Laner regarding a "CPS report" and she watched Officer Ramirez search her home.  As a result of Officer Ramirez's statements that there had been a CPS report about L.L.'s care and home and Officer Ramirez's entry into her home, L.L. was terrified that she could be removed from her home.

149.    As a result of L.L.'s removal from her MVMS class on November 4, 2024, removal from school by Officer Ramirez on that date, Officer Ramirez's statements regarding a CPS report, and Officer Ramirez's search of her home, L.L. felt she had done something wrong.

150.    L.L. became sick with worry that she had caused harm to her family.

151.    Since L.L. was removed from her class and school on November 4, 2024, L.L. has been withdrawn, distracted, and distressed.  As a result, her school grades and performance have declined.

152.    Mr. Laner, believing Officer Ramirez's representation that there had been a CPS report, was frightened and extremely distressed that there were questions about L.L.'s care in the Hubbard/Laner Home.  That extreme emotional distress has been prolonged as, at no time has any APD officer or official advised Mr. Laner that L.L.'s care is not the subject of an investigation.

153.    Mr. Laner was extremely distressed by Officer Ramirez's search of the Hubbard/Laner Home, Officer Ramirez's questioning of the suitability of the home, and the invasion of his and the family's privacy.  Additionally, Officer Ramirez's actions resulted in Mr.

Laner's loss of trust in law enforcement officers and concerns for safety in his neighborhood and community.

154.    Ms. Hubbard believed Officer Ramirez's representation that there had been a CPS report.  Ms. Hubbard was frightened and extremely distressed that there were questions about L.L.'s care in the Hubbard/Laner Home.  That extreme emotional distress has been prolonged as, at no time has any APD officer or official advised Ms. Hubbard that L.L.'s care is not the subject of an investigation.

155.    Ms. Hubbard was extremely distressed by Officer Ramirez's search of the Hubbard/Laner residence, Officer Ramirez's questioning of the suitability of the home, and the invasion of her and the family's privacy.  As was true of Mr. Laner, Ms. Hubbard lost trust in law enforcement officers and now has concerns for safety in her neighborhood and community.

156.    Officer Ramirez's actions on November 5, 2024 were intentional and designed to elicit the distress in Ms. Hubbard, Mr. Laner, and the guardians and custodians of Students 2 and 4.

157.    It was known by Officer Ramirez that L.L., Student 2, and Student 4 were being raised by relatives, other than their parents, and that each had likely had disruptions in their care and custody, possibly involving child-welfare or CYFD matters.

158.    It was known by Officer Ramirez that L.L., Student 2, and Student 4 resided in an area of Alamogordo, New Mexico known colloquially, and referred to disparagingly by law enforcement officers and first responders, as "Walker Town".

159.    "Walker Town" is known by Alamogordo law enforcement officers to be an area with low income or more-affordable housing for persons of limited economic means. Accordingly, it was known to Officer Ramirez that persons residing in "Walker Town" are not

27

likely to have college educations or significant resources, thus making them more vulnerable to suggested threats of law enforcement involvement in their family affairs.

160.    Officer Ramirez's repeated, explicit, and implied threats of his and CYFD's investigation of and intervention in L.L.'s, Student 2's, and Student 4's families, constituted an unlawful pattern, practice, and custom of bad faith, intimidation, and coercion.

APS Policies

161.    The Alamogordo Public School District, through its Board of Education and Superintendent, has promulgated written policies for the operation and affairs of the Alamogordo Public School District and Schools, which policies are published and made available by APS to APS Personnel ("APS Policies").

162.    The APS Policies apply to the operations and procedures to be utilized and implemented by Principal Boyle and the APS Personnel of MVMS.

163.    APS Policy, J-6500, states that no student will be removed from school grounds during school hours except by a person authorized to do so by the student's parent or by a person who has legal custody of the student, except as provided by law.  Before a student is removed, the person seeking to remove the student must present, to the satisfaction of the superintendent, evidence of proper authority to remove the student.  If any person or court official requests the dismissal of a student during school hours, parents should be notified as soon as possible.

164.    Principal Boyle and APS Personnel violated APS Policy J-6500 by transferring custody of L.L. to Officer Ramirez and allowing Officer Ramirez to remove L.L. from MVMS.

165.    Superintendent, Michael Crabtree, did not meet his and APS's duty, acting *in loco parentis*, of ensuring the care and safety of L.L. while L.L. was in APS's custody and on APS property.

28

166.    Superintendent, Michael Crabtree, did not meet his responsibility of ensuring that, prior to L.L. being removed from MVMS, that Officer Ramirez presented evidence of proper authority to remove L.L. from APS custody and the MVMS grounds.

167.    APS Policy, J-3400, states that a request by law enforcement agencies and/or other government agencies (i.e., Children, Youth & Families Department) to see a student, interview a student or make an arrest at school, must be verified by the principal and/or his designee, to be assured that such request is authorized by that individual's agency.  The principal will request identification and written authorization from the individual, and will verify the legitimate request by the individual's agency by telephone.  The principal must notify the Office of the Superintendent each time the police are on campus.

168.    Principal Boyle and APS Personnel violated APS Policy J-3400 by allowing Officer Ramirez to detain, seize, and arrest L.L. at MVMS.

169.    APS Policy, J-3400, further states that except in child abuse and abandonment situations, should a police officer appear on campus requesting to interview a student attending the school, the school administrator shall be notified and the school office shall contact the student's parents.   If the parents cannot be reached, the peace officer shall be requested to contact the parents and make arrangements to question the student at another time and place.  If a student is taken into custody (arrested), the arresting officer shall be requested to notify the student's parents or guardian.  The requesting officer will be asked to complete and sign a "Form for Signature of Arresting Officer."  School personnel shall make very reasonable effort to make sure parents have been notified that a student has been taken into custody.

170.    Principal Boyle and APS Personnel violated APS Policy J-3400 by failing to contact Ms. Hubbard before Officer Ramirez was allowed to take L.L. for questioning, by failing

29

to request that Officer Ramirez contact Ms. Hubbard, and by failing to require Officer Ramirez to sign a "Form for Signature of Arresting Officer".

171. APS Policies do not include detailed policies and procedures to be utilized by APS Personnel in the questioning of students believed to be witnesses or victims of crimes not involving child abuse or neglect.

172. APS Policies do not include policies and procedures to be utilized by APS Personnel in its seizure, detainment, and/or arrest of students during school hours and on APS grounds.

<u>APD Rules</u>

173. The Alamogordo Police Department has promulgated policies, practices, and procedures for the operations and affairs of the APD, which "Alamogordo Police Department Rules and Regulations" are published and made available by APD to APD Personnel ("APD Rules").

174. It is the responsibility of the Chief of the Alamogordo Police Department to enforce the APD Rules.

175. Under the APD Rules, the Chief of the APD is the Chief Executive Officer for the Alamogordo Police Department.

176. Under the APD Rules, the Chief of the APD has the authority to promulgate and enforce the Rules and Regulations for the operation of the APD.

177. Under the APD Rules, the Chief of the APD is responsible for the conduct and discipline of APD Personnel.

178. The APD Rules include practices and procedures to be utilized by APD Personnel in the questioning and arrest of a child or juvenile believed to be a delinquent child. However,

no APD Rule sets forth procedures to be utilized by APD Personnel in questioning, detaining, or arresting children who may be witnesses to or victims of crimes and who are not suspected to be delinquent children.

179.    APD Rule 4-11-02 requires APD officers to activate their MAVR (lapel cameras) during all field contacts including, but not limited to, public contacts, whether a call for service or of an investigative nature, for arrests, and during warrantless searches of individuals, vehicles, buildings, and other places.  Officers must continue to record until the conclusion of their involvement in an event.

180.    Officer Ramirez did not comply with Rule 4-11-02 as he did not activate his MAVR, lapel camera, before entering and searching the Hubbard/Laner Home.

## IV.   COUNTS I THROUGH VII

### COUNT I – 42 U.S.C. §1983

**VIOLATION OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION - RIGHT TO BE FREE FROM UNREASONABLE SEIZURE**

**STATED BY PLAINTIFF, L.L., THROUGH HER NEXT FRIEND, NANCY HUBBARD, AGAINST INDIVIDUAL DEFENDANTS, LAIGHA BOYLE, AARON RAMIREZ, AND DAVID KUNIHIRO, AND ENTITY DEFENDANTS, ALAMOGORDO BOARD OF EDUCATION, THROUGH ITS PRESIDENT, ANGELA CADWALLADER, IN HER OFFICIAL CAPACITY, AND ITS SUPERINTENDENT, MICHAEL CRABTREE, IN HIS OFFICIAL CAPACITY,  AND CITY OF ALAMOGORDO AND ALAMOGORDO POLICE DEPARTMENT, THROUGH ITS CHIEF OF POLICE, DAVID KUNIHIRO, IN HIS OFFICIAL CAPACITY**

181.    Plaintiffs incorporate by reference all preceding allegations as though set forth in their entirety.

182.    L.L., a child, has the right guaranteed and secured by the Fourth Amendment to the Constitution of the United States, U.S. Const. amend. XIV, §1, to be secure in her person from unreasonable seizures.

183.    Principal Boyle and APS Personnel exercised control over, detained, and seized L.L. by requiring that L.L. leave her MVMS classroom and report to the MVMS Office.

184.    L.L. did not feel free to leave the MVMS Office where she had been instructed to go by Principal Boyle and/or APS Personnel, and/or to disobey the instructions and commands of APS Personnel.

185.    The actions of Principal Boyle and APS Personnel constitute a seizure and arrest of L.L.

186.    Principal Boyle's and APS Personnel's Arrest of L.L. was made without a warrant issued upon probable cause.

187.    Principal Boyle's and APS Personnel's Arrest of L.L. was not based upon probable cause or a reasonable suspicion to believe that L.L. had committed a criminal act.

188.    No exception to the Fourth Amendment warrant requirement applied to Principal Boyle and APS Personnel's Arrest of L.L.

189.    No exigent circumstances existed that required L.L. to be removed from class and from school for immediate questioning about the Incident or incidents.  Further, L.L.'s removal from her class at MVMS interfered with her right to an appropriate education.

190.    Principal Boyle's and APS Personnel's seizure and Arrest of L.L. were unreasonable.

191. Officer Ramirez exercised control over, detained, and seized L.L. by requiring that L.L. leave her MVMS class and accompany Officer Ramirez off of the MVMS campus, by removing L.L. from the MVMS campus, and by transporting L.L. to an outside location.

192. Officer Ramirez's seizure of L.L. and removal of L.L. from MVMS were at the direction of APD Supervisors and Chief Kunihiro.

193. Chief Kunihiro did not assign an APD officer or investigator with the requisite training and experience to investigate the Incident or incidents. It was the responsibility of Chief Kunihiro as the chief administrator and supervisor for APD to make appropriate personnel assignments.

194. L.L. did not feel free to leave the MVMS Office where she was approached by Officer Ramirez, to terminate the encounter with Officer Ramirez, to disobey Officer Ramirez's command to get into his police car, or to refuse to answer questions posed to her by the Kids, Inc. personnel to whom Officer Ramirez delivered L.L.

195. The actions of Officer Ramirez constitute a seizure and arrest of L.L.

196. Officer Ramirez's Arrest of L.L. was made without a warrant issued upon probable cause.

197. Officer Ramirez's Arrest of L.L. was not based upon probable cause or a reasonable suspicion to believe that L.L. had committed a criminal act.

198. No exception to the Fourth Amendment warrant requirement applied to Officer Ramirez's Arrest of L.L.

199. No exigent circumstances existed that required Officer Ramirez to remove L.L. from MVMS for immediate questioning about the Incident or incidents.

200. Officer Ramirez's seizure and Arrest of L.L. were unreasonable.

201. Principle Boyle, APS Personnel, Officer Ramirez, and Chief Kunihiro knew or should have known that their actions violated L.L.'s Fourth Amendment rights. The law has been clearly-established in the Tenth Circuit since on or before the 10th Circuit decision in *Jones v. Hunt*, 410 F.3d 1211 (10th Cir. 2005) that the removal of a student from class, detention of the student, and removal of the student from school constitutes a seizure and arrest subject to Fourth-Amendment protections and limitations.

202. L.L. did and could not provide knowing, voluntary consent to her detention and arrest by Principal Boyle, APS Personnel, and Officer Ramirez. A person of L.L.'s age, experience, and minority/lack of maturity, would not be able to provide knowing, informed consent in a circumstance where the child is commanded by a school official to report and stay in a location and then instructed by a male, uniformed police officer to go with the police officer. In such a circumstance, a child would not feel free to leave or to disobey the instructions of school personnel and a law enforcement officer.

203. Acting independently and in conjunction with the APD and Officer Ramirez, Principal Boyle and APS Personnel violated L.L.'s right guaranteed and secured by the Fourth Amendment to the Constitution of the United States, U.S. Const. amend. XIV, §1, to be secure in her person and free from unreasonable seizures.

204. As a direct and proximate result of the acts of Principal Boyle and APS Personnel, L.L. has suffered and will continue to suffer injuries and damages, including, but not limited to, emotional distress, mental anguish, and suffering; treatment expenses; and costs and attorneys' fees.

205. Principal Boyle's, APS's, Officer Ramirez's, Chief Kunihiro's, and APD's actions in seizing, detaining, and arresting L.L., withholding information from L.L. related to the

34

reasons she was being detained and questioned, denying L.L. the accompaniment and care of her grandmother, and removing L.L. from MVMS, conveyed to L.L. that she had done something shameful, wrong, and illegal.  These actions were and resulted in "victim shaming".

206.    The short and long term psychological harms that are caused by victim shaming include, but are not limited to, humiliation, guilt, loss of self esteem, depression, withdrawal from others, and loss of trust in authority figures.

207.    L.L. has suffered humiliation, guilt, loss of self esteem, depression, and loss of trust in authority figures and law enforcement.  L.L., a sensitive girl and good student, has not felt safe at school or in other locations, and her grades have suffered.

208.    The actions of Principal Boyle demonstrate her intentional, deliberate, reckless, and callous disregard for and gross indifference of the rights of L.L. and the known risks of serious harm to L.L.  Principal Boyle's actions, including, but not limited to, her failure to contact Ms. Hubbard, failure to speak with, advise, and comfort, L.L., failure to comply with APS Policies, transfer of custody of L.L. to a police officer without authority to remove L.L. from MVMS, delegation of her responsibilities to oversee removal of a student from MVMS by a law enforcement officer to other APS Personnel, and failure to properly train and supervise APS Personnel, were grossly negligent, willful, wanton, and egregious.  Principle Boyle's actions were in bad faith; they were outrageous, and they shock the conscience.

209.    Principle Boyle's culpable actions support an award of punitive damages, and punitive damages should be so imposed.

210.    L.L. is entitled to an award and judgment for her actual and punitive damages against Principal Boyle, and for her costs and attorney's fees incurred in bringing her claims against Principal Boyle.

211.    The Alamogordo School District, acting through its Board, Superintendent, Michael Crabtree, and administration, had ultimate policymaking authority over the District. Superintendent Crabtree and Principal Boyle had supervisory authority over the Personnel of MVMS.

212.    The APS District, and Defendants, Superintendent Michael Crabtree and Principal Boyle, persons charged with adopting and implementing policies of APS, adopted and/or acted pursuant to an official policy, practice, and custom by which it/they permitted, allowed, and engaged in arresting APS students by detaining students and releasing students to law enforcement officers when those students were not believed to have committed crimes ("APS Arrest Practice").  In other words, APS, Superintendent Crabtree, and Principal Boyle had a policy, practice, and custom of arresting student witnesses or victims and of allowing student witnesses or victims to be arrested by APD officers on APS campuses.  The policy, practice, and custom, evidenced by the APS Personnel's arrests of L.L. and Students 1, 2, and 3, is unlawful and unconstitutional.  Upon information and belief, the District has applied its APS Arrest Practice to students other than L.L. and Students 1, 2, and 3, a matter which will be subject to discovery.

213.    Superintendent Crabtree's and Principal Boyle's direct participation in the constitutional violation, and the District's adoption, adherence, and use of the APS Arrest Practice by APS Personnel, including Principal Boyle, renders APS and the District liable for the resulting United States Constitutional violations under 42 U.S.C. §1983.

214.    Additionally, Superintendent Crabtree and Principal Boyle have the responsibility and duty to supervise all APS Personnel, and to assure their compliance with the law, constitutional mandates, and APS Policies.  Superintendent Crabtree and Principal Boyle

participated in the constitutional violation, and failed to adequately and appropriate train and supervise APS Personnel on Fourth Amendment standards.

215. The Defendant, District, through its Superintendent Crabtree and Principal Boyle, failed to properly train and supervise APS Personnel on Fourth Amendment standards and mandates applicable to the circumstances presented herein, duties reasonably required of their senior and supervisory positions as school administrators. Alternately, the District deliberately and knowingly disregarded the United States Constitution.

216. As a direct and proximate result of the acts of the District, the District's Arrest Practice, and the District's failure to train and supervise APS Personnel, L.L. has suffered and will continue to suffer injuries and damages, including, but not limited to, emotional distress, mental anguish, and suffering; treatment expenses; and costs and attorneys' fees.

217. L.L. is entitled to an award and judgment for her actual damages, costs, and attorneys' fees, against APS.

218. Officer Ramirez and Chief Kunihiro violated L.L.'s right guaranteed and secured by the Fourth Amendment to the Constitution of the United States, U.S. Const. amend. XIV, §1, to be secure in her person and free from unreasonable seizures.

219. As a direct and proximate result of the acts of Officer Ramirez and Chief Kunihiro, L.L. has suffered and will continue to suffer injuries and damages, including, but not limited to, emotional distress, mental anguish, and suffering; treatment expenses; and costs and attorneys' fees.

220. The actions of Officer Ramirez and Chief Kunihiro demonstrate their intentional, deliberate, reckless, and callous disregard for and gross indifference of the rights of L.L. and the known risks of serious harm to L.L. Officer Ramirez's and Chief Kunihiro's actions, including,

37

but not limited to, their failure to contact Ms. Hubbard and failure to follow Fourth Amendment mandates were grossly negligent, willful, wanton, and egregious. Chief Kunihiro's failures to assign an experienced officer to the investigation of the Incident or incidents, to implement appropriate policies, and to properly train and supervise APD officers and staff, were grossly negligent, willful, wanton, and egregious. Officer Ramirez's and Chief Kunihiro's actions were in bad faith; they were outrageous, and they shock the conscience.

221. Officer Ramirez's and Chief Kunihiro's culpable actions support an award of punitive damages, and punitive damages should be so imposed.

222. L.L. is entitled to an award and judgment for her actual and punitive damages against Officer Ramirez and Chief Kunihiro, and for her costs and attorney's fees incurred in bringing her claims against Officer Ramirez and Chief Kunihiro.

223. The Alamogordo Police Department, acting through its administration and Chief, David Kunihiro, has ultimate policymaking authority over the APD and supervisory authority over the officers, personnel, and agents of the APD, including Officer Ramirez.

224. The APD and Defendant, Chief Kunihiro, the APD official charged with adopting and implementing policies of APD, adopted and/or acted pursuant to an official policy by which APD and Chief Kunihiro allowed and authorized the involuntary detention, seizure, and arrest of students, and removal of students from school, when those students were not believed to have committed crimes ("Witness Arrests"). The policy, practice, and custom, evidenced by the arrests of L.L. and Students 1, 2, and 3, is unlawful and unconstitutional. Upon information and belief, the APD has applied its APD Witness Arrests practices to children other than L.L. and Students 1, 2, and 3, a matter which will be subject to discovery.

225.    Chief Kunihiro's direct participation in the constitutional violation, and the APD's adoption, adherence, and use of the APD Witness Arrests policy by APD Personnel, including Officer Ramirez, renders the City of Alamogordo and APD  liable for the resulting United States Constitutional violations under 42 U.S.C. §1983.

226.    Additionally, Chief Kunihiro has the responsibility and duty to supervise all APD Personnel and to assure their compliance with the law and constitutional mandates.  Chief Kunihiro had the duty to exercise oversight over the actions of Officer Ramirez and to properly train APD personnel, including Officer Ramirez, on Fourth Amendment standards.  Chief Kunihiro failed to adequately and appropriate train and supervise APD personnel on Fourth Amendment standards.  Chief Kunihiro further failed to assign an experienced officer to the investigation of the Incident.

227.    The Defendant, APD, through its Chief of Police, failed to properly train and supervise APD officers on Fourth Amendment standards and mandates applicable to the circumstances presented herein, duties reasonably required of their senior and supervisory positions as law enforcement officers.  Alternately, the APD deliberately and knowingly disregarded the United States Constitution.

228.    As a direct and proximate result of the acts of APD and Defendant, Chief Kunihiro, and the APD policy of allowing Witness Arrests,  L.L. has suffered and will continue to suffer injuries and damages, including, but not limited to, emotional distress, mental anguish, and suffering; treatment expenses; and costs and attorneys' fees.

229.    L.L. is entitled to an award and judgment for her actual damages, costs, and attorneys' fees, against APD.

39

## COUNT II – NEW MEXICO CIVIL RIGHTS ACT

**VIOLATION OF ARTICLE II, SECTION 10 OF THE NEW MEXICO CONSTITUTION
- RIGHT TO BE FREE FROM UNREASONABLE SEIZURE**

**STATED BY PLAINTIFF, L.L., THROUGH HER NEXT FRIEND, NANCY HUBBARD,
AGAINST ALAMOGORDO BOARD OF EDUCATION, THROUGH ITS PRESIDENT,
ANGELA CADWALLADER, IN HER OFFICIAL CAPACITY, AND ITS
SUPERINTENDENT, MICHAEL CRABTREE, IN HIS OFFICIAL CAPACITY,
AND THE CITY OF ALAMOGORDO AND ALAMOGORDO POLICE DEPARTMENT,
THROUGH ITS CHIEF OF POLICE, DAVID KUNIHIRO,
IN HIS OFFICIAL CAPACITY**

230.    Plaintiffs incorporate by reference all preceding allegations as though set forth in their entirety.

231.    At all times material to this Complaint and the allegations and claims made in Paragraphs 182 through 229 of this Complaint, Principal Boyle, Superintendent Crabtree, and APS Personnel were acting under color and within the course and scope of their authority as administrators and/or employees of the Alamogordo School District, a public body as that term is defined in the New Mexico Civil Rights Act, NMSA 1978, §41-4A-2.

232.    The District, acting through its Board, Superintendent, Michael Crabtree, and administration, had ultimate policymaking authority over the District, and supervisory authority over APS Personnel.  Superintendent Crabtree and Principal Boyle had supervisory authority over the Personnel of MVMS.

233.    Principal Boyle and APS Personnel violated L.L.'s right guaranteed and secured by N.M. Const. Art. II, § 10, to be secure in her person and free from unreasonable seizures.

234.    The actions of Principal Boyle and APS Personnel described herein constitute a seizure and arrest of L.L..

235. Principal Boyle's and APS Personnel's Arrest of L.L. was made without a warrant issued upon probable cause.

236. Principal Boyle's and APS Personnel's Arrest of L.L. was not based upon probable cause or reasonable suspicion to believe that L.L. had committed a criminal act.

237. No exception to the Fourth Amendment warrant requirement applied to Principal Boyle's and APS Personnel's Arrest of L.L.

238. No exigent circumstances existed that required L.L.'s removal from class and from school for questioning about the Incident. L.L.'s removal from her class at MVMS interfered with her right to an appropriate education.

239. Principal Boyle's and APS Personnel's seizure and Arrest of L.L. were unreasonable.

240. As a direct and proximate result of the acts of APS, Superintendent Crabtree, Principal Boyle, and APS Personnel, L.L. has suffered and will continue to suffer injuries and damages, including, but not limited to emotional distress, mental anguish, and suffering and/or aggravation of the same; treatment expenses; and costs and attorneys' fees.

241. L.L. is entitled to awards and judgment for her damages and attorneys' fees against the District pursuant to NMSA 1978, §41-4A-3 (New Mexico Civil Rights Act).

242. At all times material to this Complaint and the allegations and claims made in Paragraphs 183 through 227 of this Complaint, Officer Ramirez and Chief Kunihiro were acting under color and within the course and scope of their authority as duly commissioned officers of the Alamogordo Police Department, a public body as that term is defined in the New Mexico Civil Rights Act, NMSA 1978, §41-4A-2.

243. The Alamogordo Police Department, acting through its administration and Chief, David Kunihiro, had ultimate policymaking authority over the APD and supervisory authority over the officers and agents of the APD, including Officer Ramirez.

244. Officer Ramirez and Chief Kunihiro violated L.L.'s right guaranteed and secured by N.M. Const. Art. II, § 10, to be secure in her person and free from unreasonable seizures.

245. Officer Ramirez exercised control over, detained, and seized L.L. by requiring that L.L. leave her MVMS class and accompany Officer Ramirez off of the MVMS campus, by removing L.L. from the APS campus, and by transporting L.L. to an outside location.

246. The actions of Officer Ramirez constitute a seizure and arrest of L.L.

247. Officer Ramirez's Arrest of L.L. was made without a warrant issued upon probable cause.

248. Officer Ramirez's Arrest of L.L. was not based upon probable cause or a reasonable suspicion to believe that L.L. had committed a criminal act.

249. No exception to the Fourth Amendment warrant requirement applied to Officer Ramirez's Arrest of L.L.

250. No exigent circumstances existed that required Officer Ramirez and Chief Kunihiro to remove L.L. from MVMS for questioning about the Incident.

251. Officer Ramirez's seizure and Arrest of L.L. were unreasonable.

252. As a direct and proximate result of the acts of APD, Chief Kunihiro, and Officer Ramirez, L.L. has suffered and will continue to suffer injuries and damages, including, but not limited to emotional distress, mental anguish, and suffering and/or aggravation of the same; treatment expenses; and costs and attorneys' fees.

253. L.L. is entitled to awards and judgment for her damages and attorneys' fees against APD pursuant to NMSA 1978, §41-4A-3 (New Mexico Civil Rights Act).

## COUNT III – 42 U.S.C. §1983

### UNITED STATES CONSTITUTION -
### VIOLATION OF RIGHT TO PROCEDURAL AND SUBSTANTIVE DUE PROCESS

### STATED BY PLAINTIFF, NANCY HUBBARD, AGAINST INDIVIDUAL DEFENDANTS, LAIGHA BOYLE, AARON RAMIREZ, AND DAVID KUNIHIRO, AND ENTITY DEFENDANTS, ALAMOGORDO BOARD OF EDUCATION, THROUGH ITS PRESIDENT, ANGELA CADWALLADER, IN HER OFFICIAL CAPACITY, AND ITS SUPERINTENDENT, MICHAEL CRABTREE, IN HIS OFFICIAL CAPACITY, AND CITY OF ALAMOGORDO AND ALAMOGORDO POLICE DEPARTMENT, THROUGH ITS CHIEF OF POLICE, DAVID KUNIHIRO, IN HIS OFFICIAL CAPACITY

254. Plaintiffs incorporate by reference all preceding allegations as though set forth in their entirety.

255. Nancy Hubbard has a constitutionally-protected liberty interest in the familial companionship and society of her child, L.L. Nancy Hubbard has the right guaranteed and secured by the Fourteenth Amendment to the Constitution of the United States, U.S. Const. amend. XIV, §1, to the care, custody, and control of her child, L.L. Nancy Hubbard has the constitutionally-protected rights secured by the Fourteenth Amendment to the Constitution, U.S. Const. amend. XIV, to due process.

256. L.L. has the Fourteenth Amendment right to the care and comfort of her grandmother, Nancy Hubbard.

257. Principal Boyle and APS Personnel exercised control over, detained, and seized L.L. by requiring that L.L. leave her MVMS classroom and report to the MVMS Office, and by transferring custody of L.L. to Officer Ramirez and APD. The actions of Principal Boyle and

APS Personnel constitute a seizure and arrest of L.L., and removal of L.L. from Ms. Hubbard's custody. The interference with Ms. Hubbard's custody and liberty interest constitutes violations of Ms. Hubbard's Fourteenth Amendment substantive and procedural due process rights. U.S. Const. amend. XIV.

258. Pursuant to U.S. Const. amend. XIV, Ms. Hubbard has constitutionally-protected rights to notice and a hearing, prior to the removal of L.L. from her custody.

259. Principal Boyle and APS Personnel did not contact Ms. Hubbard or otherwise provide Ms. Hubbard with notice and an opportunity to be heard prior to removing L.L. from Ms. Hubbard's custody.

260. Principal Boyle, APS Personnel supervised by Principal Boyle, and the District, acting *in loco parentis*, had a duty to ensure that they exercised their control and custody of L.L. in conformity with Ms. Hubbard's liberty interest.

261. No exigent circumstances or imminent danger required that Principal Boyle and APS immediately remove L.L. from MVMS for questioning. No exigent circumstances or imminent danger warranted L.L.'s removal from Ms. Hubbard's custody.

262. Officer Ramirez exercised control over, detained, and seized L.L. by requiring that L.L. accompany Officer Ramirez off of the MVMS campus, by removing L.L. from the APS campus, and by transporting L.L. to an outside location. The actions of Officer Ramirez constitute a seizure and arrest of L.L., and removal of L.L. from Ms. Hubbard's custody. The interference with Ms. Hubbard's custody and liberty interest constitutes a violation of Ms. Hubbard's Fourteenth Amendment substantive and procedural due process rights. U.S. Const. amend. XIV.

263. Officer Ramirez, a supervisor with APD, or APD Personnel did not contact Ms. Hubbard or otherwise provide Ms. Hubbard with notice and an opportunity to be heard prior to removing L.L. from Ms. Hubbard's custody.

264. No exigent circumstances or imminent danger required that Officer Ramirez immediately remove L.L. from school for questioning. No exigent circumstances or imminent danger warranted L.L.'s removal from Ms. Hubbard's custody.

265. Principle Boyle, APS Personnel, Officer Ramirez, and Chief Kunihiro knew or should have known that their actions violated Ms. Hubbard's Fourteenth Amendment rights. The law is clearly established in the Tenth Circuit that the detention of a child and separation of the child from the custody of her parent, without lawful authority and without providing the parent with notice and an opportunity to be heard, impermissibly deprive a parent of her liberty interest, and deny the parent her substantive and procedural due process rights, contrary to the Fourteenth Amendment.

266. As the direct and proximate result of Principle Boyle's, APS Personnel's, and APS's actions, Ms. Hubbard has suffered damages including, but not limited to, extreme emotional distress and mental anguish.

267. The actions of Principal Boyle demonstrate her intentional, deliberate, reckless, and callous disregard for and gross indifference of the rights of Ms. Hubbard and the known risks of serious harm to Ms. Hubbard. Principal Boyle's actions, including, but not limited to, her failure to contact Ms. Hubbard, failure to speak with, advise, and comfort, L.L., failure to comply with APS Policies, transfer of custody of L.L. to a police officer without authority to remove L.L. from MVMS, delegation of her responsibilities to oversee the removal of L.L. from MVMS by a law enforcement officer to other APS Personnel, and failure to properly train and

45

supervise APS staff, were grossly negligent, willful, wanton, and egregious. Principle Boyle's actions were in bad faith; they were outrageous, and they shock the conscience.

268. Principle Boyle's culpable actions support an award of punitive damages, and punitive damages should be so imposed.

269. Ms. Hubbard is entitled to an award and judgment for her actual and punitive damages against Principal Boyle, and for her costs and attorney's fees incurred in bringing her claims against Principal Boyle.

270. The Alamogordo School District, acting through its Board, Superintendent, Michael Crabtree, and administration, had ultimate policymaking authority over the District, and supervisory authority over APS Personnel. Superintendent Crabtree and Principal Boyle had supervisory authority over the Personnel of MVMS.

271. The District, and Defendants, Superintendent Crabtree and Principal Boyle, persons charged with adopting and implementing policies of APS, adopted and/or acted pursuant to an official policy, practice, and custom by which it/they permitted, allowed, and engaged in arresting APS students by detaining students and releasing students to law enforcement officers when those students were not believed to have committed crimes ("APS Arrest Practice"), without providing notice to or an opportunity to be heard by the parents of the students. By the APS Arrest Practices, the District deprived students' parents, including Ms. Hubbard, of their constitutionally-protected liberty interests and due process of law, in violation of the Fourteenth Amendment. The policy, practice, and custom is unlawful and unconstitutional.

272. The adoption, adherence, and use of the APS Arrest Practice by APS Personnel, including Principal Boyle, renders APS and the District liable for the resulting United States Constitutional violations under 42 U.S.C. §1983.

46

273. Additionally, Superintendent Crabtree and Principal Boyle have the responsibility and duty to supervise MVMS Personnel and to assure their compliance with the law and constitutional mandates. Superintendent Crabtree and Principal Boyle had the duty to exercise oversight over the actions of APS Personnel and to properly train APS personnel, including on Fourteenth Amendment standards. Superintendent Crabtree and Principal Boyle failed to adequately and appropriate train and supervise APS personnel on Fourteenth Amendment standards.

274. The Defendant, APD, through its Chief of Police, failed to properly train and supervise APD officers on Fourteenth Amendment standards and mandates applicable to the circumstances presented herein, duties reasonably required of their senior and supervisory positions as law enforcement officers. Alternately, the APD deliberately and knowingly disregarded the United States Constitution.

275. As a direct and proximate result of the acts of APS and the APS Arrest Practice, Ms. Hubbard has suffered and will continue to suffer injuries and damages, including, but not limited to, emotional distress, mental anguish, and suffering; treatment expenses; and costs and attorneys' fees.

276. Ms. Hubbard is entitled to an award and judgment for her actual damages, costs, and attorneys' fees, against APS.

277. Officer Ramirez, upon the instruction and/or with the consent of Chief Kunihiro or a supervisor with the APD, exercised control over, detained, and seized L.L. by requiring that L.L. accompany Officer Ramirez off of the MVMS campus, by removing L.L. from the APS campus, and by transporting L.L. to an outside location. The actions of Officer Ramirez and Chief Kunihiro constitute a seizure and arrest of L.L., and removal of L.L. from Ms. Hubbard's

custody.  The interference with Ms. Hubbard's custody and liberty interest constitutes a violation of Ms. Hubbard's Fourteenth Amendment substantive and procedural due process rights.  U.S. Const. amend. XIV.

278.    Officer Ramirez, a supervisor with APD, and APD Personnel did not contact Ms. Hubbard or otherwise provide Ms. Hubbard with notice and an opportunity to be heard prior to removing L.L. from Ms. Hubbard's custody.

279.    No exigent circumstances or imminent danger required that Officer Ramirez immediately remove L.L. from school for questioning.  No exigent circumstances or imminent danger warranted L.L.'s removal from Ms. Hubbard's custody.

280.    As a direct and proximate result of the acts of Officer Ramirez and Chief Kunihiro, L.L. has suffered and will continue to suffer injuries and damages, including, but not limited to, emotional distress, mental anguish, and suffering; treatment expenses; and costs and attorneys' fees.

281.    The actions of Officer Ramirez and Chief Kunihiro demonstrate their intentional, deliberate, reckless, and callous disregard for and gross indifference of the rights of Ms. Hubbard and the known risks of serious harm to Ms. Hubbard.  Officer Ramirez's and Chief Kunihiro's actions, including, but not limited to, their failure to contact Ms. Hubbard and willful disregard of Fourth and Fourteenth Amendment mandates, were grossly negligent, willful, wanton, and egregious.  Chief Kunihiro's failures to assign an experienced officer to the investigation of the Incident, to create and implement appropriate policies, and to properly train and supervise APD officers, were grossly negligent, willful, wanton, and egregious. Officer Ramirez's and Chief Kunihiro's actions were in bad faith; they were outrageous, and they shock the conscience.

48

282. Officer Ramirez's and Chief Kunihiro's culpable actions support an award of punitive damages, and punitive damages should be so imposed.

283. Ms. Hubbard is entitled to an award and judgment for her actual and punitive damages against Officer Ramirez and Chief Kunihiro, and for her costs and attorney's fees incurred in bringing her claims against Officer Ramirez and Chief Kunihiro.

284. The Alamogordo Police Department, acting through its administration and Chief, David Kunihiro, has ultimate policymaking authority over the APD and supervisory authority over the officers and agents of the APD, including Officer Ramirez.

285. The APD and Defendant, Chief Kunihiro, the APD official charged with adopting and implementing policies of APD, adopted and/or acted pursuant to an official policy, practice, and custom by which APD and Chief Kunihiro allowed and authorized the involuntary detention, seizure, and arrest of students and removal of students from school, when those students were not believed to have committed a crime ("Witness Arrests"), without providing notice or an opportunity to be heard by the parents of the students. By the APD Witness Arrests Practices, APD deprived students' parents, including Ms. Hubbard, of their constitutionally-protected liberty interests and due process of law, in violation of the Fourteenth Amendment. The policy, practice, and custom is unlawful and unconstitutional.

286. The adoption, adherence, and use of the APD Witness Arrests practice by APD Personnel, including Officer Ramirez, renders the City of Alamogordo and APD liable for the resulting United States Constitutional violations under 42 U.S.C. §1983.

287. Additionally, Chief Kunihiro has the responsibility and duty to supervise all APD Personnel and to assure their compliance with the law and constitutional mandates. Chief Kunihiro had the duty to exercise oversight over the actions of Officer Ramirez and to properly

49

train APD personnel, including Officer Ramirez, on Fourteenth Amendment standards. Chief Kunihiro failed to adequately and appropriate train and supervise APD personnel on Fourteenth Amendment standards. Chief Kunihiro further failed to assign an experienced officer to the investigation of the Incident.

288.    The Defendant, APD, through its Chief of Police, failed to properly train and supervise APD officers on Fourteenth Amendment standards and mandates applicable to the circumstances presented herein, duties reasonably required of their senior and supervisory positions as law enforcement officers. Alternately, the APD deliberately and knowingly disregarded the United States Constitution.

289.    As a direct and proximate result of the acts of APD and Defendant, Chief Kunihiro, and the APD policy of allowing Witness Arrests without providing notice and opportunity to be heard to a parent or guardian, Ms. Hubbard has suffered and will continue to suffer injuries and damages, including, but not limited to, emotional distress, mental anguish, and suffering; treatment expenses; and costs and attorneys' fees.

290.    Ms. Hubbard is entitled to an award and judgment for her actual damages, costs, and attorneys' fees, against APD.

## COUNT IV – NEW MEXICO CIVIL RIGHTS ACT

**VIOLATION OF ARTICLE II, SECTION 18 OF THE NEW MEXICO CONSITUTION - RIGHT TO PROCEDURAL AND SUBSTANTIVE DUE PROCESS**

**STATED BY PLAINTIFF, NANCY HUBBARD, AGAINST ALAMOGORDO BOARD OF EDUCATION, THROUGH ITS PRESIDENT, ANGELA CADWALLADER, IN HER OFFICIAL CAPACITY, AND ITS SUPERINTENDENT, MICHAEL CRABTREE, IN HIS OFFICIAL CAPACITY, AND THE CITY OF ALAMOGORDO AND ALAMOGORDO POLICE DEPARTMENT, THROUGH ITS CHIEF OF POLICE, DAVID KUNIHIRO, IN HIS OFFICIAL CAPACITY**

291. Plaintiffs incorporate by reference all preceding allegations as though set forth in their entirety.

292. At all times material to this Complaint and the allegations and claims made in Paragraphs 255 to 290 of this Complaint, Principal Boyle and APS Personnel were acting under color and within the course and scope of their authority as administrators and/or employees of the Alamogordo School District, a public body as that term is defined in the New Mexico Civil Rights Act, NMSA 1978, §41-4A-2.

293. The Alamogordo School District, acting through its Board, Superintendent, Michael Crabtree, and administration, had ultimate policymaking authority over the District, and supervisory authority over APS Personnel. Superintendent Crabtree and Principal Boyle had supervisory authority over the Personnel of MVMS.

294. Principal Boyle and APS Personnel deprived Ms. Hubbard of her liberty interest in the care, custody, and society of her child, and right guaranteed and secured by N.M. Const. Art. II, § 18 of the New Mexico Constitution to due process.

295. As a direct and proximate result of the acts of APS, Principal Boyle, Superintendent Crabtree, and APS Personnel, Ms. Hubbard has suffered and will continue to suffer injuries and damages, including, but not limited to emotional distress, mental anguish, and suffering and/or aggravation of the same; treatment expenses; and costs and attorneys' fees.

296. Ms. Hubbard is entitled to awards and judgment for her damages and attorneys' fees against the District pursuant to NMSA 1978, §41-4A-3 (New Mexico Civil Rights Act).

297. At all times material to this Complaint and the allegations and claims made in Paragraphs 254 to 290 of this Complaint, Officer Ramirez and Chief Kunihiro were acting under color and within the course and scope of their authority as duly commissioned officers of the

51

Alamogordo Police Department, a public body as that term is defined in the New Mexico Civil Rights Act, NMSA 1978, §41-4A-2.

298.     The Alamogordo Police Department, acting through its administration and Chief, David Kunihiro, had ultimate policymaking authority over the APD and supervisory authority over the officers and agents of the APD, including Officer Ramirez.

299.     Officer Ramirez and Chief Kunihiro deprived Ms. Hubbard of her liberty interest in the care, custody, and society of her child, and right guaranteed and secured by N.M. Const. Art. II, § 18 of the New Mexico Constitution to due process.

300.     As a direct and proximate result of the acts of APD, Officer Ramirez, and Chief Kunihiro, Ms. Hubbard has suffered and will continue to suffer injuries and damages, including, but not limited to emotional distress, mental anguish, and suffering and/or aggravation of the same; treatment expenses; and costs and attorneys' fees.

301.     Ms. Hubbard is entitled to awards and judgment for her damages and attorneys' fees against APD pursuant to NMSA 1978, §41-4A-3 (New Mexico Civil Rights Act).

## COUNT V – 42 U.S.C. §1983

**VIOLATION OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION - RIGHT TO BE FREE FROM UNREASONABLE SEARCH**

**STATED BY PLAINTIFFS, L.L., THROUGH HER NEXT FRIEND, NANCY HUBBARD, NANCY HUBBARD, INDIVIDUALLY, AND RAYMOND LANER AGAINST INDIVIDUAL DEFENDANTS, AARON RAMIREZ AND DAVID KUNIHIRO, AND ENTITY DEFENDANT, CITY OF ALAMOGORDO AND ALAMOGORDO POLICE DEPARTMENT, THROUGH ITS CHIEF OF POLICE, DAVID KUNIHIRO, IN HIS OFFICIAL CAPACITY**

302.     Plaintiffs incorporate by reference all preceding allegations as though set forth in their entirety.

52

303. Plaintiffs, Nancy Hubbard, Raymond Laner, and L.L. have constitutionally-protected privacy interests in their home, and rights guaranteed and secured by the Fourth Amendment to the Constitution of the United States, U.S. Const. amend. IV ("Fourth Amendment") to be free from unreasonable searches.

304. On November 5, 2025, Officer Ramirez went to the home of L.L. Plaintiff, Nancy Hubbard, owns the home. Ms. Hubbard, Mr. Laner, L.L., L.L.'s younger brother, and two other children of Nancy Hubbard reside in the home.

305. On November 5, 2025, Officer Ramirez, at the direction of or with the approval of his APD supervisors and Chief Kunihiro, unlawfully entered the home of Ms. Hubbard, Mr. Laner, and L.L., the Hubbard/Laner Homer, and conducted an unlawful, unconstitutional search of the home in violation of Ms. Hubbard's, Mr. Laner's, and L.L.'s rights guaranteed by the Fourth Amendment to the Constitution of the United States, U.S. Const. amend. IV ("Fourth Amendment").

306. Officer Ramirez entered and searched the Hubbard/Laner Home without a warrant and without probable cause, a reasonable suspicion, or rational basis to believe that any of the occupants and residents of the home, including Ms. Hubbard, Mr. Laner, and L.L., had committed a crime, or that a crime was being committed on the premises.

307. Officer Ramirez entered and searched the Hubbard/Laner Home without a warrant, and without probable cause, a reasonable suspicion, or rational basis to believe that L.L. was an abused or neglected child, as those terms are defined under New Mexico law, or that exigent circumstances existed to justify immediate entry into the Hubbard/Laner Home.

308. To the extent that Officer Ramirez predicated any suspicion of criminal activity or neglect or abuse of L.L. on her families' Native American ethnicity, socio-economic status,

53

family composition, or the location of the Hubbard/Laner home in a lower, socio-economic area of Alamogordo, New Mexico, the suspicion was not reasonable, and Officer Ramirez's search on that basis violated Ms. Hubbard's, Mr. Laner's, and L.L.'s Fourteenth Amendment rights to equal protection of the laws.  U.S. Const. amend. XIV.

309.    No exception to the United States Constitution Fourth Amendment warrant requirements applies to Officer Ramirez's entry into and search of the Hubbard/Laner home.

310.    Ms. Hubbard, Mr.  Laner, and L.L. did not knowingly and voluntarily consent to Officer Ramirez's entry into and search of the Hubbard/Laner Home.

311.    Officer Ramirez did not ask permission from Mr.  Laner to enter the Hubbard/Laner Home.  Rather, Officer Ramirez stated to Mr. Laner that Officer Ramirez "had" to enter the home.  Officer Ramirez's statements and actions indicated, unequivocally, that Officer Ramirez would be entering the home.

312.    Mr. Laner's cooperation with Officer Ramirez's entry into the Hubbard/Laner Home was consistent with his understanding that Officer Ramirez was exercising his lawful authority as a law enforcement officer to enter the Hubbard/Laner Home pursuant to a "CPS report" for which Officer Ramirez "had to", or was required to, inspect the Home, and that any interference by Mr. Laner would be unlawful.

313.    Mr. Laner's understanding and cooperation was predicated upon Officer Ramirez's show and demonstration of authority, and the false statement by Officer Ramirez that an anonymous "CPS report" had been made about L.L. on the evening of November 4, 2025.

314.    Officer Ramirez made the false representation that a child welfare report had been received by APD with the intent, knowledge, and understanding that it was false and that it would induce fear in Mr. Laner, Ms. Hubbard, and L.L. of possible adverse consequences for

54

them if they did not cooperate including, but not limited to, an arrest or harm to Mr. Laner if he interfered, and removal of L.L. from the Hubbard/Laner Home.

315.    Officer Ramirez's intent to induce fear is demonstrated by his knowledge of the area in which the Hubbard/Laner Home is located, knowledge that L.L. and Students 2 and 4 resided with relatives, rather than parents, and his repeated false assertions to the families of L.L., Student 2, and Student 4, that child-welfare, abuse, or neglect allegations had been raised against them.

316.    Upon information and belief, Officer Ramirez did not visit and search the home of Student 3 on November 5, 2025 or a time thereafter.   Student 3 lives in a different, more economically-advantaged area of Alamogordo, New Mexico than Students 2, 4, and L.L.

317.    Officer Ramirez's intent to induce fear in Mr. Laner, Ms. Hubbard, and L.L. is further evidenced by the existing Ramirez BWV in which Officer Ramirez made a show of force and communicated to the grandmother of Student 4 that she did not have the ability to stop Officer Ramirez from arresting Student 4 and taking Student 4 for questioning.  As the APD has destroyed and/or failed to collect and preserve lapel-camera video from Officer Ramirez's encounters with L.L. and Mr. Laner (spoliation), Plaintiffs are entitled to all inferences that Officer Ramirez's actions with regard to L.L. and Mr. Laner were consistent with Officer Ramirez's displays of force.

318.    Mr. Laner's cooperation with Officer Ramirez's entry into the Hubbard/Laner Home was the product of duress and coercion by Officer Ramirez.

319.    Further, Mr. Laner, a Native American and person of color, believed he was not in a position to make any protest or to display any opposition or interference with Officer Ramirez's questions, commands, and actions.

320. In the Alamogordo, New Mexico and Otero County, New Mexico communities, law enforcement entities and officers have a reputation of treating persons of color, particularly Native Americans, harshly. Mr. Laner was aware of the perceived harm that would result to a person of color who displayed any opposition to a command of a law enforcement officer.

321. As a direct and proximate result of the acts of Officer Ramirez and Chief Kunihiro, Ms. Hubbard, Mr. Laner, and L.L. have suffered and will continue to suffer injuries and damages, including, but not limited to, emotional distress, mental anguish, and suffering; treatment expenses; and costs and attorneys' fees.

322. Officer Ramirez and Chief Kunihiro knew or should have known that their actions violated Ms. Hubbard's, Mr. Laner's, and L.L.'s Fourth Amendment rights to be free from unreasonable searches. The law is clearly established in the Tenth Circuit that a search may be conducted only pursuant to a warrant, issued upon probable cause, or within the parameters of a recognized exception to the Fourth Amendment warrant requirement. Officer Ramirez and Chief Kunihiro knew or should have known that no exception to the warrant requirement applied under the circumstances, and that no exigent circumstances justified the warrantless entry and search of the Hubbard/Laner Home.

323. The actions of Officer Ramirez and Chief Kunihiro demonstrate their intentional, deliberate, reckless, and callous disregard for and gross indifference of the rights of Ms. Hubbard, Mr. Laner, and L.L. and the known risks of serious harm to Ms. Hubbard, Mr. Laner, and L.L.. Officer Ramirez's actions, including, but not limited to, his falsely representing that L.L. was the subject of a child welfare complaint, his falsely representing that he had the lawful authority to enter the Hubbard/Laner Home, his use of similar, coercive methods with the families of Students 2 and 4 to gain entry and to search their homes, his more-favorable

56

treatment of Student 3 and the family of Student 3 whose home Officer Ramirez did not search, and his failure to activate his lapel camera and/or his destruction of lapel camera video, were grossly negligent, willful, wanton, and egregious.   Chief Kunihiro's failure to assign an experienced officer to the investigation of the Incident or incidents, failure to create and implement appropriate policies, failure to properly train and supervise APD officers, and approval of Officer Ramirez's actions, were grossly negligent, willful, wanton, and egregious. Officer Ramirez's and Chief Kunihiro's actions were in bad faith; they were outrageous, and they shock the conscience.

324.    Officer Ramirez's and Chief Kunihiro's culpable actions support an award of punitive damages, and punitive damages should be so imposed.

325.    Ms. Hubbard, Mr. Laner, and L.L. are  entitled to awards and judgments for their actual and punitive damages against Officer Ramirez and Chief Kunihiro, and for their costs and attorney's fees incurred in bringing their claims against Officer Ramirez and Chief Kunihiro.

326.    The Alamogordo Police Department, acting through its administration and Chief, David Kunihiro, has ultimate policymaking authority over the APD and supervisory authority over the officers and agents of the APD, including Officer Ramirez.

327.    The APD and Defendant, Chief Kunihiro, the APD official charged with adopting and implementing policies of APD, adopted and/or acted pursuant to an official policy, practice, and custom by which APD and Chief Kunihiro allowed and authorized APD police officers to: conduct warrantless searches of the residences of child victims or witnesses (not involving lawful investigations of child abuse or neglect by a family member); to apply disparate standards for searches depending on the race, ethnicity, and socio-economic status of the persons searched, to wit, engage in unlawful, warrantless searches of the homes of persons residing in lower-

57

income areas of Alamogordo, New Mexico, known by APD, its administrators, and officers, to be primarily-occupied by persons of color and persons of limited economic means, although the persons are witnesses or victims of criminal activity, not suspects; to represent lawful authority to conduct a search when no valid basis for a warrantless search existed; and to use deception and coercion as a method of gaining cooperation with an unlawful search. The policy, practices, and customs are demonstrated by the consistency of Officer Ramirez's actions in using deception to gain access to the homes of Students 2, 4, and L.L., and in Officer Cisneros' and Officer Padilla's failure to interject or otherwise correct the false statements made by Officer Ramirez that he had the authority to arrest and take Student 4, despite her guardian's protests. The policies, practices, and customs of APS are unlawful.

328. The adoption and adherence of APD to its unlawful policy, practices, and customs, renders the City of Alamogordo and APD liable for the resulting United States Constitutional violations under 42 U.S.C. §1983.

329. Additionally, Chief Kunihiro has the responsibility and duty to draft policies to guide APD officers in the legal requirements for valid searched under the Fourth Amendment, to supervise all APD Personnel, and to assure their compliance with the law and constitutional mandates. Chief Kunihiro had the duty to exercise oversight over the actions of Officer Ramirez and to properly train APD personnel, including Officer Ramirez, on Fourth Amendment standards. Chief Kunihiro failed to: adopt a policy addressed to searches and seizures of witnesses and victims (as opposed to criminal suspects or delinquent children); and adequately and appropriately train and supervise APD personnel on Fourth Amendment standards. Chief Kunihiro further failed to assign an experienced officer to the investigation of the Incident.

330.    The Defendant, APD, through its Chief of Police, failed to properly train and supervise APD officers on Fourth Amendment standards and mandates applicable to the circumstances presented herein, duties reasonably required of their senior and supervisory positions as law enforcement officers.    Alternately, the APD deliberately and knowingly disregarded the United States Constitution.

331.    As a direct and proximate result of the acts of APD and Defendant, Chief Kunihiro, and the APD policy, Ms. Hubbard, Mr. Laner, and L.L. have suffered and will continue to suffer injuries and damages, including, but not limited to, emotional distress, mental anguish, and suffering; treatment expenses; and costs and attorneys' fees.

332.    Ms. Hubbard, Mr. Laner, and L.L. are entitled to awards and judgment for their actual damages, costs, and attorneys' fees, against APD.

## COUNT VI – NEW MEXICO CIVIL RIGHTS ACT

**VIOLATION OF ARTICLE II, SECTION X OF THE NEW MEXICO CONSTITUTION - RIGHT TO BE FREE FROM UNREASONABLE SEARCH**

**STATED BY PLAINTIFFS, L.L., THROUGH HER NEXT FRIEND, NANCY HUBBARD, NANCY HUBBARD, INDIVIDUALLY, AND RAYMOND LANER AGAINST THE CITY OF ALAMOGORDO AND ALAMOGORDO POLICE DEPARTMENT, THROUGH ITS CHIEF OF POLICE, DAVID KUNIHIRO, IN HIS OFFICIAL CAPACITY**

333.    Plaintiffs incorporate by reference all preceding allegations as though set forth in their entirety.

334.    At all times material to this Complaint and the allegations and claims made in Paragraphs 303 to 332 of this Complaint, Officer Ramirez and Chief Kunihiro were acting under color and within the course and scope of their authority as duly commissioned officers of the

59

Alamogordo Police Department, a public body as that term is defined in the New Mexico Civil Rights Act, NMSA 1978, §41-4A-2.

335.    The Alamogordo Police Department, acting through its administration and Chief, David Kunihiro, had ultimate policymaking authority over the APD and supervisory authority over the officers and agents of the APD, including Officer Ramirez.

336.    On November 5, 2025, Officer Ramirez, upon the instruction or with the approval of his APD supervisor and Chief Kunihiro, unlawfully entered the home of Ms. Hubbard, Mr. Laner, and L.L. and conducted an unlawful, unconstitutional search of Hubbard/Laner Home in violation of Ms. Hubbard's, Mr. Laner's, and L.L.'s rights guaranteed by Article II, § X of the New Mexico Constitution to be free from unreasonable search.   N.M. Const. Art. II, §X.

337.    Officer Ramirez's search of the Hubbard/Laner Home was made without a warrant issued upon probable cause.

338.    Officer Ramirez entered and searched the Hubbard/Laner Home without probable cause, a reasonable suspicion, or rational basis to believe that any of the occupants and residents of the home, including Ms. Hubbard, Mr. Laner, and L.L. had committed a crime, or that a crime was being committed on the premises.

339.    Officer Ramirez entered and searched the Hubbard/Laner Home without probable cause, a reasonable suspicion, or rational basis to believe that L.L. was an abused or neglected child, as those terms are defined under New Mexico law, or that exigent circumstances existed to justify immediate, lawful entry into the  Hubbard/Laner Home.

340.    No exception to the New Mexico Constitution Article II, § X warrant requirement applied to Officer Ramirez's search of the Hubbard/Laner Home.

341.    Officer Ramirez's search of the Hubbard/Laner Home was unreasonable.

342.    As a direct and proximate result of the acts of APD, Officer Ramirez, and Chief Kunihiro, Ms. Hubbard, Mr. Laner, and L.L. have suffered and will continue to suffer injuries and damages, including, but not limited to emotional distress, mental anguish, and suffering and/or aggravation of the same; treatment expenses; and costs and attorneys' fees.

343.    Ms. Hubbard, Mr. Laner, and L.L. are entitled to awards and judgment for their damages and attorneys' fees against APD pursuant to NMSA 1978, §41-4A-3 (New Mexico Civil Rights Act).

## COUNT VII – STATE LAW

### SPOLIATION OF EVIDENCE

**STATED BY PLAINTIFFS, L.L., THROUGH HER NEXT FRIEND, NANCY HUBBARD, NANCY HUBBARD, INDIVIDUALLY, AND RAYMOND LANER AGAINST INDIVIDUAL DEFENDANTS, AARON RAMIREZ AND DAVID KUNIHIRO, AND ENTITY DEFENDANT, THE CITY OF ALAMOGORDO AND ALAMOGORDO POLICE DEPARTMENT, THROUGH ITS CHIEF OF POLICE, DAVID KUNIHIRO, IN HIS OFFICIAL CAPACITY**

344.    Plaintiffs incorporate by reference all preceding allegations as though set forth in their entirety.

345.    All conditions precedent to the initiation of these claims and proceedings, including the provision of notice pursuant to the New Mexico Tort Claims Act, NMSA 1978, §§41-4-16 (1977),  have been satisfied.

346.    The APD, Officer Ramirez, and/or APD Personnel, failed to preserve and/or destroyed the Ramirez BWV of Officer Ramirez's interactions with L.L. on November 4, 2025 and interactions with Mr. Laner on November 5, 2024.

347.    The Ramirez BWV is a public record as that term is defined under the New Mexico Public Records Act, NMSA 1978, §14-3-1 et seq.

348. The APD, Officer Ramirez, and/or APD Personnel, in destroying of failing to preserve the Ramirez BWV, violated the New Mexico Public Records Act, NMSA 1978, §14-3-1 et seq., and more particularly, NMSA 1978, §14-3-13 (1959), which requires that every custodian of public records shall carefully protect and preserve public records.

349. Upon information and belief, additional public records related to or evidence of the Alamogordo Police Department's functions, policies, procedures, and operations may have been destroyed.

350. The Ramirez BWV has evidentiary value in these proceedings and in a potential lawsuit which existed at the time the Ramirez BWV was intentionally destroyed, mutilated, or significantly altered.

351. At the time of the destruction, APD knew of a potential lawsuit.

352. The intent on the part of APD, Officer Ramirez, and/or APD Personnel was to disrupt or defeat the lawsuit.

353. The destruction of the Ramirez BWV has caused Plaintiffs damages and may cause an inability to prove elements of Plaintiffs' lawsuit, including, but not limited to, the content of the Officer Ramirez's statements to L.L. and Mr. Laner and actions in effecting an unlawful search of the Hubbard/Laner Home.

354. The Plaintiffs have suffered damages as a result of APD's, Officer Ramirez's, and/or APD Personnel's spoliation of evidence. Plaintiffs are entitled to an award for their resulting damages, and are entitled to the benefit of all inferences or presumptions as a result of the APD's, Officer Ramirez's, and/or APD Personnel's destruction of evidence.

## V.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, L.L, Nancy Hubbard, and Raymond Laner, pursuant to 42 U.S.C. §§1983 and 1988 and New Mexico law, respectfully pray the Court:

A.      Enter judgment for L.L. and against the named Defendants on Count I of the Complaint; award L.L. compensatory damages against the named Defendants on Counts I in an amount to be proved and determined at trial; assess punitive damages against the individual Defendants, Laigha Boyle, Aaron Ramirez, and David Kunihiro, and award L.L. those punitive damages on Count I; and, award L.L. her costs and attorneys' fees;

B.      Enter judgment for L.L. and against the named Defendants on Count II of the Complaint; award L.L. compensatory damages against the named Defendants on Counts II in an amount to be proved and determined at trial; and, award L.L. her costs and attorneys' fees;

C.      Enter judgment for Nancy Hubbard and against the named Defendants on Count III of the Complaint; award Ms. Hubbard compensatory damages against the named Defendants on Counts III in an amount to be proved and determined at trial; assess punitive damages against the individual Defendants, Laigha Boyle, Aaron Ramirez, and David Kunihiro, and award Nancy Hubbard those punitive damages on Count III; and, award Ms. Hubbard her costs and attorneys' fees;

D.      Enter judgment for Nancy Hubbard and against the named Defendants on Count IV of the Complaint; award Ms. Hubbard compensatory damages against the named Defendants on Counts IV in an amount to be proved and determined at trial; and, award Ms. Hubbard her costs and attorneys' fees;

E.      Enter judgment for Nancy Hubbard, Raymond Laner, and L.L. and against the named Defendants on Count V of the Complaint; award Plaintiffs compensatory damages against

63

the named Defendants on Counts IV in an amount to be proved and determined at trial; assess punitive damages against the individual Defendants, Aaron Ramirez and David Kunihiro, and award those punitive damages to Plaintiffs on Count V; and, award Plaintiffs their costs and attorneys' fees;

F.      Enter judgment for Nancy Hubbard, Raymond Laner, and L.L. and against the named Defendants on Count VI of the Complaint; award Plaintiffs compensatory damages against the named Defendants on Count VI in an amount to be proved and determined at trial; and, award Plaintiffs their costs and attorneys' fees;

G.      Grant Plaintiffs such relief and remedies and impose such inferences as are proper on Count VII of the Complaint; and, award Plaintiffs compensatory damages against the Defendants on Count VII in an amount to proved and determined at trial;

H.      Award Plaintiffs pre-judgment and post-judgment interest, as provided by law; and,

I.      Award such other and further relief as the Court deems just and proper.

J.      A jury trial is demanded.

Respectfully Submitted;

COURVOISIER LAW, LLC

By: /s/ *Rebekah A. Scott Courvoisier*
Rebekah A. Scott Courvoisier
1109 Indiana Avenue
Alamogordo, New Mexico 88310
(575) 434-1226
law1@nmlaw.net
Attorney for Plaintiffs